Good morning. May it please the court, Mark Ferrario appearing on behalf of the appellant, Mr. Quinn, who is in the audience right behind me. I would like to, at the outset, reserve two minutes for rebuttal. You have in front of you a rather long record that poses a very discreet question. And that is, on this record, can this court say that the district court properly deprived my client of his ability to pursue his derivative rights? And I think it is important that we step back from some of the hyperbole in the briefs, much of which really doesn't have anything to do with the issue at hand, and look at this case and the posture in which this case came first to the lower court judge and now you. The lower court judge at the hearing on the supplemental motion to dismiss started off asking the right question. The court was interested to find out if my client was afforded an opportunity similar to the derivative plaintiff in the sound infinity case. And if you look at the record, that's how that argument starts out. And the judge asked the right question. Because you have to remember, when this matter got before the judge, my client had no opportunity to engage in discovery. Discovery had been stayed and was, in fact, under two protective orders that were engineered in a state court proceeding. So this case moves forward. In the middle of the stay process, the Anvil defendants decide that they're going to get rid of this lawsuit by amending their articles of incorporation. Against that backdrop, the judge determines that my client's case cannot go forward. And what I find interesting is, while he starts off asking the right question, he doesn't delve deep enough to get the right answer. And I'm not conceding that the sound infinity case controls in this court. But it does provide some insight as to what perhaps should be done before a judge cuts somebody off at the knees in the face of corporate action, such as that taken by Anvil. The judge asks Mr. Smith, did Mr. Quinn have the same opportunity as the derivative plaintiff in sound infinity? Mr. Smith says yes. Well, I would just ask that you read the sound infinity case, and you will see there are stark contrasts. Number one, a temporary restraining order was issued in that case. Number two, a hearing on a preliminary injunction was held over two days, 30 days apart. The court there cites to the fact that after hearing extensive testimony and reviewing voluminous submissions, that there was no basis to go forward and accord the plaintiff their equitable standing. We had no such process here. And when you read the briefs, the Anvil defendants indicate that my client had the opportunity to engage in discovery, that my client was dilatory, and the judge says you could have put forward evidence at the temporary restraining order hearing, or you could have put forward evidence at the hearing on the motion to dismiss. Well, that's an interesting concept when you are under a stay, and you cannot issue a subpoena. You cannot notice a deposition. You cannot engage in written discovery. That's kind of a twisted view of having a full opportunity to present evidence at a hearing, I'd submit. What this judge should have done is called timeout. Now, this was on the fast track, I'll grant you. The Anvil defendants sent out, or they gave a hint as to what they were going to do in June of 08. I find it interesting that they would say my client should have done something then, because you could imagine the argument that would have been proffered by the Anvil defendants had we done something before we knew what they were going to do. They would have said it's premature. And quite frankly, I'm usually on that side of the table, so I understand that argument. It wasn't until mid-July that the proxy statement was issued. My client moved expeditiously to take discovery. It was objected to by the appellee. A motion for temporary restraining order was filed, and the judge, without holding an evidentiary hearing, summarily denied it. They then filed the supplemental motion, and again, without any discovery, without any hearing, the judge upheld the corporate action, thereby terminating my client's status as a shareholder, and then negating his ability to move forward in the derivative action. And I submit to you that process was fundamentally flawed and unfair. Can't you have remedies, though, for that? I mean, your derivative action seems to me to be a separate complaint brought on behalf of all the shareholders. Your client's no longer a shareholder. But what you're now trying to contest is the validity of the reverse stock split. So can't you just file a direct action claiming that that harmed him in various ways? Well, you have to step back and say, and the case law makes this clear, that that action taken by Anvil has to first withstand scrutiny before they can deprive my client of his derivative rights. And that's what we're challenging. It's interesting that you say that you could bring direct claims because there's cases all over the country that say, no, you can't bring direct claims, that you're now left with your dissenter's rights remedies. Well, that's what he has, right? He has dissenter's rights. Absolutely. What is unlawful about what the Anvil Corporation did? Well, we put a number of things in the brief, and I'll commend to your reading, first of all, the fact that they terminated rights that my client had under the stock. And look at the legend on the stock certificate. It refutes their argument that there wasn't a separate class of Anvil stock. There, in fact, was a separate class of Anvil stock. Look at the stock certificate. It says my client had this put right. It created a separate class. We contend that that class should have had its own vote. That's one procedural flaw. But look at the- Right, but where is that claim cognizable? In a derivative action? This is a claim that your client was injured. No, we're challenging the action they took. That's what's at issue here. We're challenging the action they took. Let me go back. For them to cut off my client's derivative rights, they have to take an appropriate action. Wait a second. They're not cutting off your derivative rights. They did. They bought the stock so that your client couldn't bring it. It wasn't a proper plaintiff under the federal rules of civil procedure. Exactly. They wanted to get rid of this derivative suit. That's exactly what they did. What is unlawful about that? If you do it the right way, nothing, which gets to the policy question that's raised in the briefing, and that is if you assume you do it appropriately, should equitable standing be conferred where the purpose of the act is to negate the derivative suit? You just raised the policy question there. But the predicate has to be an appropriate corporate action. That's what's missing here. There wasn't an appropriate corporate action. That's never been tested in court. The judge never allowed us to move forward and challenge that corporate action. And when you read their brief, they say, well, we didn't prove fraud. We didn't do this. Where was the hearing? Where was the trial? The lower court and the anvil defense would hold us to a standard that would adhere in the event you had a trial in a full-blown evidentiary hearing. Where else but in this proceeding would we challenge their action? They came to court. They went to the judge. They said, look, we've terminated his ‑‑ we've redeemed his shares. He's no longer a shareholder. Therefore, the derivative case should be terminated. We said in the lower court that action was inappropriate. That set up the issue. Before the judge just bought their claim, lock, stock, and barrel, he should have called timeout and we should have had the evidentiary hearing that occurred in the sound infinity case on which they rely. That didn't happen here. If at the end of that process a judge determines that their actions were appropriate, that in fact they took appropriate corporate action during the pendency of this lawsuit, after a hearing, after discovery, then that would raise the question of should this court adopt an equitable standing rule such that a corporation cannot move forward during the pendency of an action and for the sole purpose of ending that action and terminate or buy back someone's shareholder rights. All right. Thank you, counsel. I think we understand your argument. Thank you. Good morning. Scott Smith of Riddell Williams representing Anvil Corporation. My client, John McPherson, is also in court with me today. The issue before the trial court was whether Plaintiff Forrest Quinn was a suitable plaintiff under Civil Rule 23.1. That rule provides that a derivative action may not be maintained if it appears that the plaintiff does not fairly and adequately represent the interests of shareholders who are similarly situated in enforcing the rights of the corporation. It was a very basic threshold decision that trial courts make in derivative actions and similarly in class action cases. And in the Ninth Circuit, the law is clear, as in other jurisdictions, you must be a shareholder at all times in order to be a suitable plaintiff. Because the plaintiff did not satisfy the continuous ownership rule, the court properly dismissed the lawsuit. Yeah, but there is something that doesn't smell quite right about the corporation that's the defendant in the lawsuit taking a corporate action to eliminate the standing of the one shareholder who's suing. Well, that argument actually has been rejected by the sound infinity decision. That was the primary argument of the plaintiff in that case, is that you can't ever take a corporate action if the result is that I personally That's not the point. This is the sole purpose of this corporate action. I guess I could imagine, I don't know, you're representing a private company, but I could imagine that if that action had a detriment to the value of the shares, the existing shares, one of your shareholder employees could bring an action not acting with good business judgment and doing something for the sole reason of eliminating a lawsuit against the company. But the Ninth Circuit so far has not recognized any exception to the continuous ownership rule. There are exceptions, but I'm not sure. I don't really think they apply here. It's where it deprives everybody, all shareholders. You're right, Your Honor. Everybody's deprived of the ability, which is the merger situation. If as a result of the corporate action, there's absolutely nobody that could pursue the claims, then courts outside the Ninth Circuit on some occasions have recognized equitable standing. In the Ninth Circuit and under Washington law, corporations can do that. They can take actions even though one of the effects might be that an individual may lose his shares. The protections in Washington's corporate statute are, number one, you've got to have a supermajority vote, have a two-thirds vote. In our situation, the vote is nearly unanimous. Second, the aggrieved shareholder has dissenter's rights. He may pursue an action to be paid whatever his particular shares are worth. He could also argue, he doesn't have the right to argue that you could challenge that the dissenter's rights evaluation and appraisal wasn't adequate to meet the value of what he held in terms of his shares. He can contest that. That's the effect of his particular dissenter's rights. Yes, he has some individual remedy. Yes. And the only effect of the corporate action in this particular case is that this particular individual can't move forward with the lawsuit because he doesn't satisfy the continuous ownership test. Mr. Smith, here's the question I had that at least was as you were arguing. So when this appellant loses his shares and is no longer, if we apply a continuous ownership rule, able to maintain a derivative action, were there other shareholders like who had more than 60 shares, you know, and came out of the reverse stock split with some shares, like who could press these claims if they wanted to do so? Absolutely. If they had merit, they could have pursued them. Or if they didn't, they could try to do that.  A series of lawsuits by Mr. Quinn against the company, constantly pounding the table claiming the shares are being undervalued. Not a single shareholder has taken up the mantle. The shareholders could do it. The other officers could do it if they thought it had merit. The ESOP could do it because the ESOP is regulated. The federal regulators could do it. But nobody did that. Nobody did that. I think that speaks volumes about the merits of the claim. But what you're pointing out, though, is that this fact pattern distinguished itself from the cases in which there is a merger. In the merger cases, other courts outside the Ninth Circuit have on occasion recognized equitable standing because nobody could do it. But in this case, the other shareholders could have pursued this action if they'd wanted to do so. And nobody has chosen to do that. All the shareholders, they're all corporate employees, is that right? I think almost everybody is an employee of the company. One of the goals, and I'll point this out, Your Honor, is that the sole purpose of this was not to eliminate this particular lawsuit or this particular shareholder's standing. This was a move by the corporation to continue its effort to become an employee-owned company. So this doesn't even fall within the fact pattern of some cases in which there's absolutely no motive other than to eliminate the lawsuit. Was there a hearing in the district court where the district court made findings about the reasons for the reverse stock split? What the trial judge did, and there was both a detailed written opinion, and then you can also see the judge's remarks during the transcript of the hearing, frankly, he was unimpressed with the arguments that there's something sinister going on here, that there was fraud in the process that led to the reverse stock split. That doesn't answer Judge Gold's question. My apologies. The question was, was there sort of an evidentiary hearing on the motives behind the reverse stock split? No, there was no evidentiary hearing with live witnesses. There were affidavits submitted by the parties. But what distinguishes this case from others is that you've got a situation where, as the trial judge noted, Mr. Quinn, you waited until the last minute to seek a tear. You didn't give anybody any opportunity to conduct a live hearing. And on the record that you have submitted, you don't even come close to the allegations of fraud. There were a couple of potential arguments that might possibly have merit, but, again, Mr. Quinn, who had the opportunity to present evidence, failed to do it in a way that would present a pretty tough statement, clear, cogent, convincing evidence of each and every one of the nine elements of fraud. Didn't even come close. And so one of the things, obviously, a trial judge has to do in responding to issues raised before the trial judge is engage in a level of process that makes sense, given the timing, the exigencies. And the short time period here was a result of Mr. Quinn's delay in moving forward with his claims. Although counsel complains that Mr. Quinn didn't get a fair shake, he didn't get a fair hearing, he has not appealed the judge's discovery rulings. They're simply not part of the appeal before this court. So that would be one reason why not to worsen those grounds. But, again, he had the opportunity. When you look at those things that he says he might have been able to get into had he been able to conduct additional discovery, it would make a difference in the outcome of the shareholder vote. One of the key things to remember is that the shareholders were informed of Mr. Quinn's myriad complaints. Historically, he had been suing the company for five years. There were occasional employee updates. After this particular shareholder vote was scheduled, there were a series of employee meetings, and Mr. Quinn, of course, was invited to attend the shareholder meeting. He did not do so. So instead, the chairman of the company took the unusual step at that shareholder meeting and described Mr. Quinn's claims. He even took a break then and passed out his five-page, frankly, it was quite a diatribe, but it listed every allegation of wrongdoing. And as Judge Lasnik remarked during the hearing, he still didn't come forward with one single shareholder who said, oh, wow, I didn't realize that. Boy, I was duped. If I'd known then what I know now, I would not have voted in favor of the stock split. The vote was nearly unanimous. And one of the things that Mr. Quinn may not have the perspective to realize is that his angry rants in his letters and communications probably backfired in terms of reminding the shareholders that one of the benefits, not the sole benefit, but one of the benefits of voting in favor of this is that it might end what had been five years of seemingly interminable litigation. All right. Thank you. Do you have any questions? No, I do not. Thank you. Thank you, counsel. Quinn v. Angle will be submitted.
judges: Mills, Wardlaw, Gould